**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IMPULSE DOWNHOLE SOLUTIONS LTD and IMPULSE DOWNHOLE TOOLS USA LTD, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Civil No. 4:23-cv-02954 |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| DOWNHOLE WELL SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT DOWNHOLE WELL SOLUTIONS, LLC'S RULE 50(a) MOTION FOR
<u>JUDGMENT AS A MATTER OF LAW AS TO NON-INFRINGEMENT AND DAMAGES</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

NATURE AND STAGE OF THE CASE........................................................................ 1

STATEMENT OF THE ISSUES TO BE DECIDED.................................................... 1

LEGAL STANDARD...................................................................................................... 2

ARGUMENT ................................................................................................................... 3

      A.     Impulse failed to prove that DWS's friction reduction tools practice any asserted claims, either literally or under the doctrine of equivalents.................... 3

            1.     No reasonable jury could find the "irregular pattern" limitation in all asserted claims of the '976 Patent is met. .................................... 3

            2.     No reasonable jury could find the "cyclic, polyrhythmic pattern" limitation in all asserted claims of the '584 Patent is met. ........................ 7

            3.     No reasonable jury could find the "thereby activate . . . to thereby produce fluid pressure pulses" limitation in all asserted claims of the '337 Patent is met........................................................................................ 9

            4.     No reasonable jury could find infringement under the doctrine of equivalents. ............................................................................................ 10

      B.     Impulse presented no evidence that DWS makes, uses, sells, or offers to sell "a drilling string" as required by claim 7 of the '337 Patent. .............................. 11

      C.     Impulse presented no evidence that DWS infringes under 35 U.S.C. § 271(b)........................................................................................................... 12

      D.     Impulse presented no evidence that DWS infringes under 35 U.S.C. § 271(c)........................................................................................................... 13

      E.     Because Impulse failed to mark its patented tools, it is barred from recovering damages before providing actual notice of infringement. ................. 14

      F.     Impulse is barred from recovering pre-suit damages because there is no evidence that it provided actual notice of infringement......................................... 16

      G.     Impulse failed to apportion its damages to the value attributable to the alleged inventions. ............................................................................................ 17

            1.     Impulse's "patent-family" damages theory is not patent- or invention-specific apportionment. .......................................................... 18

2.      Impulse presented no reliable apportionment for undisputedly conventional components of the accused tools. ........................................ 19

H.      Impulse's other damages evidence fails as a matter of law. ................................ 20

1.      Impulse failed to show that the NOV/TLL agreement is technically comparable for purposes of the hypothetical negotiation. ........................ 21

2.      Impulse failed to prove the technical and functional link required to support damages for any convoyed sales. ................................................. 23

CONCLUSION ..................................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ADASA, Inc. v. Avery Dennison Corp.*,
55 F.4th 900 (Fed. Cir. 2022) ........................................................................ 21, 22

*Am. Seating Co. v. USSC Grp., Inc.*,
514 F.3d 1262 (Fed. Cir. 2008) ............................................................................ 23

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
24 F.3d 178 (Fed. Cir. 1994) .......................................................... 14, 15, 16, 17

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ............................................................................. 19

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ........................................................................... 14

*CloudofChange, LLC v. NCR Corp.*,
123 F.4th 1333 (Fed. Cir. 2024) .......................................................................... 12

*CloudofChange, LLC v. NCR Corp.*,
145 S. Ct. 2684 (2025) .......................................................................................... 12

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005) ........................................................................... 12

*Dominion Energy, Inc. v. Alstom Grid LLC*,
725 F. App'x 980 (Fed. Cir. 2018) ........................................................................ 7

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) ........................................................................... 12

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018) ............................................................... 18, 19, 20

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) ........................................................................... 23

*Foreman v. Babcock & Wilcox Co.*,
117 F.3d 800 (5th Cir. 1997) ................................................................................. 2

*Forest Lab'ys, Inc. v. Abbott Lab'ys*,
239 F.3d 1305 (Fed. Cir. 2001) ............................................................................. 3

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ....................................................................................... 12, 14

*Laitram Corp. v. Rexnord, Inc.*,
  939 F.2d 1533 (Fed. Cir. 1991) ................................................................ 3

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ................................................. 18, 21, 22

*Lubby Holdings LLC v. Chung*,
  11 F.4th 1355 (Fed. Cir. 2021) ................................................... 16, 17

*Maxell, Ltd. v. Samsung Elecs. Co.*,
  805 F. Supp. 3d 749 (E.D. Tex. 2025) ....................................................... 7

*McConney v. City of Houston*,
  863 F.2d 1180 (5th Cir. 1989) .................................................................. 2

*NexStep, Inc. v. Comcast Cable Commc'ns, LLC*,
  119 F.4th 1355 (Fed. Cir. 2024) ............................................................ 10

*NexStep, Inc. v. Comcast Cable Commc'ns, LLC*,
  145 S. Ct. 2794 (2025) ............................................................................ 10

*Omega Pats., LLC v. CalAmp Corp.*,
  13 F.4th 1361 (Fed. Cir. 2021) ................................................... 18, 19, 20

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
  491 F.3d 1342 (Fed. Cir. 2007) ............................................................. 14

*Rex Med., L.P. v. Intuitive Surgical, Inc.*,
  156 F.4th 1289 (Fed. Cir. 2025) ...................................................... 18, 20

*Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*,
  80 F.4th 607 (5th Cir. 2023) ..................................................................... 2

*Rite-Hite Corp. v. Kelley Co.*,
  56 F.3d 1538 (Fed. Cir. 1995) ............................................................... 24

*Roche Diagnostics v. Meso Scale*,
  30 F.4th 1109 (Fed. Cir. 2022) ............................................................. 12

*SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*,
  127 F.3d 1462 (Fed. Cir. 1997) ............................................................. 16

*TecSec, Inc. v. Adobe Inc.*,
  978 F.3d 1278 (Fed. Cir. 2020) ............................................................. 20

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ............................................................. 20

**Statutes**

35 U.S.C. § 271(a) ........................................................................................... 11, 12

35 U.S.C. § 271(b) ....................................................................................... 1, 12, 13

35 U.S.C. § 271(c) ....................................................................................... 2, 13, 14

35 U.S.C. § 284 ..................................................................................................... 19

35 U.S.C. § 287(a) ........................................................................................... passim

**Rules**

FED. R. CIV. P. 50(a) ........................................................................................ 1, 2

## INTRODUCTION

Defendant Downhole Well Solutions, LLC ("DWS") respectfully moves for judgment as a matter of law ("JMOL") under Federal Rule of Civil Procedure 50(a) with respect to non-infringement (both direct and indirect) and damages for (i) claims 1 and 7 of the '976 Patent, (ii) claims 1, 4, and 11 of the '584 Patent, and (iii) claims 1, 4, 5, and 7 of the '337 Patent—the only claims Impulse asserted at trial. Given the evidence Impulse presented at trial, no reasonable jury could find for Impulse on any of these issues and judgment should be entered in DWS's favor. *See* Trial Tr. 203:9–11 (Feb. 27, 2026); Trial Tr. 4:7–5:23, 9:4–10:5 (Mar. 2, 2026).

## NATURE AND STAGE OF THE CASE

Trial in this patent-infringement case began on February 23, 2026. Impulse rested on February 27. At the end of Impulse's case-in-chief, DWS indicated that it intended to formally move for judgment as a matter of law under Rule 50(a). Trial Tr. 203:9–11 (Feb. 27, 2026). DWS argued the underlying bases for its motion before trial on Monday, March 2, 2026. Trial Tr. 4:7–5:23, 9:4–10:5 (Mar. 2, 2026).

## STATEMENT OF THE ISSUES TO BE DECIDED

1.  Whether Impulse failed to present legally sufficient evidence that DWS's PowerGLIDE and PowerGLIDE On-Demand tools satisfy three dispositive claim limitations either literally or under the doctrine of equivalents: (1) the "irregular pattern" limitation required by all asserted claims of the '976 Patent, (2) the "cyclic, polyrhythmic pattern" limitation required by all asserted claims of the '584 Patent, and (3) the "thereby activate . . . to thereby produce fluid pressure pulses" limitation required by all asserted claims of the '337 Patent.

2.  Whether Impulse failed to present legally sufficient evidence that DWS made, used, sold, offered to sell, or imported "a drilling string" meeting claim 7 of the '337 Patent.

3.  Whether Impulse failed to present legally sufficient evidence to prove the elements unique to inducement under 35 U.S.C. § 271(b), including knowledge of infringement and specific intent/affirmative acts to encourage infringement.

- 1 -

4.      Whether Impulse failed to present legally sufficient evidence to prove the elements unique to contributory infringement under 35 U.S.C. § 271(c), including that any accused component is a non-staple article especially made or adapted for infringement, and the required knowledge.

5.      Whether Impulse failed to prove compliance with the marking requirements of 35 U.S.C. § 287(a) such that it is barred from recovering damages prior to providing actual notice of infringement.

6.      Whether Impulse failed to present legally sufficient evidence that it provided actual notice of infringement sufficient to support any pre-suit damages.

7.      Whether Impulse failed to present legally sufficient evidence apportioning its reasonable-royalty damages to the incremental value attributable to the claimed inventions, including (i) failing to apportion among distinct asserted patents and (ii) failing to apportion away from conventional components.

8.      Whether Impulse failed to present legally sufficient evidence to support additional damages predicates relied upon by its damages expert, including (i) technical comparability of the NOV/TLL agreement and (ii) the technical/functional link required for convoyed sales.

## LEGAL STANDARD

Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). Under this standard, "[a] mere scintilla of evidence is insufficient to present a question for the jury." *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 616 (5th Cir. 2023) (quoting *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir. 1997)). And, "[w]hile a verdict may be sustained by 'reasonable inferences' from the evidence as a whole, plainly unreasonable inferences or those which amount to mere speculation or conjecture do not suffice." *McConney v. City of Houston*, 863 F.2d 1180, 1186 (5th Cir. 1989) (internal quotations omitted).

## ARGUMENT

**A.    Impulse failed to prove that DWS's friction reduction tools practice any asserted claims, either literally or under the doctrine of equivalents.**

DWS moves for judgment as a matter of law that Impulse has failed to carry its burden to prove that DWS's accused friction reduction tools—PowerGLIDE and PowerGLIDE On-Demand—practice any asserted claim, either literally or under the doctrine of equivalents. To prove infringement, Impulse must present evidence that each accused product meets *every* limitation of at least one asserted claim, and failure of proof as to any single required limitation defeats infringement as a matter of law. *See Forest Lab'ys, Inc. v. Abbott Lab'ys*, 239 F.3d 1305, 1310 (Fed. Cir. 2001); *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991) (holding "the failure to meet a single limitation is sufficient to negate infringement of the claim").

At the close of Impulse's case-in-chief, Impulse had not presented legally sufficient evidence on at least three dispositive claim limitations in all asserted claims: (1) the "irregular pattern" limitation in independent claim 1 of the '976 Patent,[1] (2) the "cyclic, polyrhythmic pattern" limitation in independent claim 1 of the '584 Patent,[2] and (3) the "thereby activate . . . to thereby produce fluid pressure pulses" limitation in independent claim 1 of the '337 Patent.[3]

### 1.    No reasonable jury could find the "irregular pattern" limitation in all asserted claims of the '976 Patent is met.

The '976 Patent is directed to a downhole drilling tool that uses a multiport valve assembly to vary the flow of drilling fluid through the tool, which produces an irregular pattern of pressure pulses. *See* PTX-002.0002. Independent claim 1 of the '976 Patent requires that "***fluid flow***

---

[1] Claim 7, the only other claim asserted from the '976 Patent, depends from claim 1. *See* PTX-002.0012; Trial Tr. 155:5–18 (Feb. 26, 2026).

[2] Claims 4 and 11, the only other claims asserted from the '584 Patent, depend from claim 1. *See* PTX-001.0021; Trial Tr. 162:5–11, 163:12–16 (Feb. 26, 2026).

[3] Claims 4 and 5 of the '337 Patent depend from claim 1, and claim 7 incorporates the elements of claim 1 by reference. *See* PTX-003.0020; Trial Tr. 166:24–167:5, 167:22–168:14 (Feb. 26, 2026).

through the ports of the flow head and the flow restrictor *is varied in an irregular pattern*, the irregular pattern comprising a pattern in which an orientation of the flow head at a defined position in a cycle of the rotor is different between consecutive cycles of the rotor." PTX-002.0012 (emphases added).[4] Fluid flow is a function of the total flow area through a valve and the flow rate of the fluid. *E.g.*, Trial Tr. 153:12–154:12 (Feb. 25, 2026); Trial Tr. 183:8–184:15 (Feb. 26, 2026); Trial Tr. 62:9–20 (Feb. 27, 2026). And fluid flow can be characterized by a pressure pattern— because when total flow area is high, pressure is low; and when total flow area is low, pressure is high. *E.g.*, Trial Tr. 154:10–19 (Feb. 25, 2026); Trial Tr. 184:8–25 (Feb. 26, 2026).

Impulse's infringement theory depends on proving that DWS's tools generate this claimed "irregular pattern" of fluid flow. But Impulse's own technical theory links the fluid flow to the *port geometry* and resulting total flow area. Trial Tr. 44:14–45:23 (Feb. 27, 2026) (admitting geometry can be analyzed to plot pressure patterns based on changing flow area and flow rate); *see* Trial Tr. 30:24–31:7 (Feb. 27, 2026) (admitting that when the valve assembly is put together, different stationary valve plates can result in different changing total flow area when combined with the same rotary valve plate for a 5.25" PowerGLIDE). The record shows that all of DWS's PowerGLIDE and PowerGLIDE On-Demand valve plates (both rotary valve plates and stationary valve plates) use *regular*, symmetric port geometry—ports that are the same shape and size and evenly spaced—so the total flow area (and resulting pressure/flow variation) varies in a *regular*, rhythmic way rather than an "irregular pattern":

---

[4] The Court held that no construction is necessary for "irregular pattern" and the term carries its plain and ordinary meaning. Dkt. No. 79 at 7.

5.25" PowerGLIDE Rotary Valve Plate
(DX385.1 / DX172.1)[5]



5.25" PowerGLIDE Stationary Valve Plate
(DX388.1)[6]



5.25" PowerGLIDE OD Rotary Valve Plate
(DX169.1)[7]



5.25" PowerGLIDE OD Stationary Valve
Plate (DX390.1 / DX170.1)[8]



Consistent with that geometry, Impulse's technical expert, Dr. Harri Kytömaa, conceded at trial that the ports on DWS's tools are the same shape and size, at the same distance from the center, and evenly distributed 120 degrees apart. *See* Trial Tr. 43:16–44:4 (Feb. 27, 2026); Trial Tr. 26:18–27:5, 27:9–28:4 (Feb. 27, 2026) (5.25" PowerGLIDE); Trial Tr. 32:7–33:5 (Feb. 27, 2026) (6.75" PowerGLIDE); Trial Tr. 34:14–20, 35:21–36:11 (Feb. 27, 2026) (5.25" PowerGLIDE On-Demand); Trial Tr. 38:9–14, 42:4–20, 43:20–44:10 (Feb. 27, 2026) (6.75" PowerGLIDE On-Demand).

---

[5] *See also* DX392.1 (6.75" PowerGLIDE Rotary Valve Plate).
[6] *See also* DX393.1 (6.75" PowerGLIDE Stationary Valve Plate).
[7] *See also* DX287.1 (6.75" PowerGLIDE On-Demand Valve Plate).
[8] *See also* DX288.1 (6.75" PowerGLIDE On-Demand Stationary Valve Plate).

To the extent Impulse relies on test data to show an "irregular pattern," that testing is not reliable evidence of infringement and cannot carry Impulse's burden on the "pattern" limitations. The record establishes multiple, compounding flaws in Dr. Kytömaa's test setup and execution that sever any meaningful connection between the measured data and the accused products as sold and used in the field. In particular, Dr. Kytömaa's testing suffered from many uncontrolled variables and non-representative modifications:

- **Physical modification of the tested tools.** Dr. Kytömaa drilled and tapped holes into the tool housing and attached pressure-sensing equipment, altering the tool from the condition in which it is provided to customers. Trial Tr. 65:23–67:13 (Feb. 27, 2026). These modifications change the system being measured and further undermine any claim that the test results reflect operation of the accused product in its ordinary configuration.

- **Non-accused "foreign" components inserted into the tool string.** Dr. Kytömaa placed additional components between the shock tool, power section, and valve assembly—components supplied by ***Impulse*** and stamped "***Impulse***" and "***ID***." Trial Tr. 67:14–71:20 (Feb. 27, 2026). Those components are not provided by DWS to customers for use with the accused tools, and thus the tested configuration was not any accused product as rented or provided to DWS's customers.

- **Unknown test fluid properties.** The fluid Dr. Kytömaa used during his tests contained unknown particulates, and Dr. Kytömaa did not measure the actual mud weight of the fluid used in the test. Trial Tr. 61:5–13 (Feb. 27, 2026). Instead, he assumed an approximate mud weight of 8.3 pounds per gallon—an approximation that injects additional uncertainty into the very signal he purports to measure. Trial Tr. 61:14–18 (Feb. 27, 2026); *see also* Trial Tr. 62:9–20 (Feb. 27, 2026) (fluid flow impacts pressure).

- **Testing outside recommended operating ranges.** Dr. Kytömaa also tested at flow rates outside the recommended operating range. Trial Tr. 86:15–88:8, 88:21–90:22 (Feb. 27, 2026). Testing outside the operating envelope is not evidence of how the accused products function in normal use and cannot reliably establish the claimed "pattern" limitations.

- **Fluid leaks.** Dr. Kytömaa admitted there were leaks during testing. Trial Tr. 62:21–22, 64:1–20 (Feb. 27, 2026). He did not measure the extent of the leaks or account for their impact on the pressure/flow measurements. Trial Tr. 65:16–20 (Feb. 27, 2026).

Taken together, these flaws mean the testing does not reliably show what Impulse claims it shows—much less that the accused products, as sold and used, satisfy the asserted claim limitations. Accordingly, Dr. Kytömaa's testing cannot salvage Impulse's infringement proof and further supports judgment as a matter of law of non-infringement. *See Maxell, Ltd. v. Samsung Elecs. Co.*, 805 F. Supp. 3d 749, 771 (E.D. Tex. 2025) (granting judgment as a matter of law on non-infringement, holding "[w]ithout [the plaintiff's technical expert's] conclusory testimony and product testing, [the plaintiff] has nothing to support the jury's verdict of infringement"); *see also Dominion Energy, Inc. v. Alstom Grid LLC*, 725 F. App'x 980, 986 (Fed. Cir. 2018) (concluding no reasonable jury could find infringement where plaintiff's expert's testimony was "conclusory, unsupported, contrary to the evidence in the case, or not directed to the claim limitation at issue").

On this record, no reasonable jury could find that DWS's tools satisfy the "irregular pattern" limitation in claim 1 of the '976 Patent, and the Court should therefore enter judgment as a matter of law that DWS does not infringe any asserted claims from that patent.

### 2. No reasonable jury could find the "cyclic, polyrhythmic pattern" limitation in all asserted claims of the '584 Patent is met.

The '584 Patent is directed to a flow controlling downhole tool that uses a multiport valve assembly to vary the flow of drilling fluid through the tool, which produces a cyclic, polyrhythmic pattern of pressure pulses. *See* PTX-001.0002. Independent claim 1 requires that "***fluid pressure resulting from fluid flow*** through the ports of the flow head and the flow restrictor ***is constrained to a cyclic, polyrhythmic pattern***." PTX-001.0020 (emphases added). The Court construed "a cyclic, polyrhythmic pattern" term as "a pattern of: two or more different rhythms within one revolution of the flow head wherein a rhythm refers to either varying amplitude or duration between pressure peaks." Dkt. No. 79 at 7.

Impulse's own theory again links the alleged "polyrhythmic" effect to ***port configurations*** like varying sizes/shapes and irregular arrangements. *See* Trial Tr. 44:14–45:23, 48:18–50:4, Feb. 27, 2026. The record (including Dr. Kytömaa's trial testimony) confirms that the '584 Patent's exemplary embodiments depict ports of ***differing*** sizes/shapes and irregularity, and that DWS's tools do not have those port configurations. *See* PTX-001.0008–13; Trial Tr. 196:22–198:19, 200:1–18, 202:1–16, 202:24–204:9, 204:23–205:7, 207:22–208:14, Feb. 26, 2026 (agreeing all flow restrictors of the '584 Patent have ports of different shapes, sizes, or spacing around the face plate); DX385.1 & DX388.1 (5.25" PowerGLIDE rotary and stationary plates); DX169.1 & DX390.1 (5.25" PowerGLIDE On-Demand rotary and stationary plates); DX392.1 & DX393.1 (6.75" PowerGLIDE rotary and stationary plates); DX287.1 & DX288.1 (6.75" PowerGLIDE On-Demand rotary and stationary plates). Critically, the record also supports the straightforward technical point that where the accused tool's valve-plate ports are all the same size and shape and symmetrically arranged, the tool does not produce the claimed cyclic, polyrhythmic pattern. *See* Trial Tr. 44:18–45:23, Feb. 27, 2026 (admitting geometry can be analyzed to plot pressure patterns based on changing flow area and flow rate); Trial Tr. 30:24–31:7, Feb. 27, 2026 (admitting that when the valve assembly is put together, different stationary valve plates can result in different changing total flow area when combined with the same rotary valve plate for a 5.25" PowerGLIDE). In other words, ***regular*** port geometry yields a ***regular*** pattern rather than a polyrhythmic one. And to the extent Impulse relies on test data to show a "cyclic, polyrhythmic pattern," that testing fails for the same reasons it fails with respect to the "irregular pattern" limitation discussed above. *See* Trial Tr. 61:5–18, 62:9–22, 64:1–20, 65:16–20, 65:23–71:20, 86:17–88:8, 88:21–90:22, Feb. 27, 2026.

Accordingly, Impulse failed to present legally sufficient evidence that either the PowerGLIDE or PowerGLIDE On-Demand tools satisfy the "cyclic, polyrhythmic pattern" limitation in claim 1 of the '584 Patent, and the Court should enter judgment as a matter of law that DWS does not infringe any asserted claims from that patent.

> **3.     No reasonable jury could find the "thereby activate . . . to thereby produce fluid pressure pulses" limitation in all asserted claims of the '337 Patent is met.**

The '337 Patent is directed to a selectively activatable friction reduction tool and assembly. *See* PTX-003.0002. The assembly includes an activation tool which selectively diverts drilling fluid into the power section of the friction reduction tool, and it can consist of a ball catch assembly that activates the friction reduction tool when a ball seats in the catch such that drilling fluid flows into the power section rather than through a central bore of the tool. PTX-003.0015 at 6:11–19, 6:51–7:9. Independent claim 1 of the '337 Patent requires "the assembly [to be] activatable when drilling fluid flow through the central passage is blocked with a projectile to divert the drilling fluid flow through the motor ***to thereby activate the rotor and drive the rotary component, . . . to thereby produce fluid pressure pulses***." PTX-003.0020 (emphasis added).[9]

Impulse's infringement theory fails as a matter of law because the record shows DWS's PowerGLIDE On-Demand tools[10] produce pressure pulses ***even before*** the projectile/ball is seated—meaning the motor/rotor are ***already active***, and the projectile does not "***thereby activate***" the rotor or "***thereby produce*** fluid pressure pulses" as required by the claims. *See* DTX-185.2. Indeed, Dr. Kytömaa admitted that, before the ball was dropped for the On-Demand tool test, the "rotor of the tool was rotating, and there was flow through the mud motor." Trial Tr. 40:1–20 (Feb.

---

[9] The Court held that no construction is necessary for "activatable" and the term carries its plain and ordinary meaning. Dkt. No. 79 at 18.

[10] Impulse only accuses the PowerGLIDE On-Demand tools, not any PowerGLIDE tools, of infringing the '337 Patent.

27, 2026). Impulse presented no evidence to the contrary, such as comparisons of the pressure pulses generated *before* and *after* the ball is seated in the tool. Trial Tr. 40:22–41:17 (Feb. 27, 2026) (conceding did not measure fluid flow after ball was seated). Thus, Impulse has not presented legally sufficient evidence that DWS's tools satisfy the claimed "activatable when . . . blocked . . . *to thereby activate* the rotor" and "*thereby produce* fluid pressure pulses" limitation.

The Court should enter judgment as a matter of law that DWS does not infringe claim 1, claims 4 and 5 (which depend from claim 1), or claim 7 (which incorporates claim 1's limitations by reference). *See* Trial Tr. 155:14–16 (Feb. 26, 2026).

**4.      No reasonable jury could find infringement under the doctrine of equivalents.**

A district court is "obliged to grant" judgment as a matter of law when a plaintiff's technical expert fails to provide the requisite "particularized testimony and linking argument" necessary to prove infringement under the doctrine of equivalents. *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, 119 F.4th 1355, 1375 (Fed. Cir. 2024), *cert. denied*, 145 S. Ct. 2794 (2025).

Here, Impulse pleaded infringement under the doctrine of equivalents (*see* Dkt. No. 1, ¶¶ 32, 39, 56, 63, 76, 84), but it presented no doctrine of equivalents case at trial. Its technical expert did not offer any limitation-by-limitation equivalents analysis or provide any particularized testimony mapping any asserted claim limitation to an alleged equivalent feature of PowerGLIDE or PowerGLIDE On-Demand. *See generally* Trial Tr. 68:12–173:23 (Feb. 26, 2026). Indeed, the word "equivalent" was only uttered six (6) times in front of the jury during Impulse's case-in-chief, and never with reference to the doctrine of equivalents. Trial Tr. 38:8 (Feb. 24, 2026) (referring to "equivalent" tool configurations in Impulse's tools); Trial Tr. 59:24 (Feb. 24, 2026) (referring to equivalent positions at Impulse in the United States and Canada); Trial Tr. 77:19, 91:15 (Feb. 24, 2026) (referring to equivalent technologies for customers looking to arrange a competitive

market); Trial Tr. 136:24 (Feb. 25, 2026) (referring to foreign patent equivalents). Impulse offered no other evidence from which a reasonable jury could find equivalence as to each required limitation. Because the record contains no legally sufficient evidentiary basis to support infringement under the doctrine of equivalents, judgment as a matter of law is required. *NexStep*, 119 F.4th at 1375.

**B.    Impulse presented no evidence that DWS makes, uses, sells, or offers to sell "a drilling string" as required by claim 7 of the '337 Patent.**

DWS is entitled to judgment as a matter of law that it does not infringe claim 7 of the '337 Patent for another independent reason: Impulse presented ***no evidence*** that DWS makes, uses, sells, or offers to sell "a drilling string."

Claim 7 of the '337 Patent is not a claim to a friction reduction tool by itself. It recites "[a] ***drilling string*** comprising a plurality of the [friction reduction] assemblies of claim 1." PTX-003.0020 (emphasis added); Trial Tr. 168:4–169:9 (Feb. 26, 2026). Because the claim is to a ***drilling string***, Impulse must prove that DWS ***itself*** made, used, sold, offered to sell, or imported a drilling string meeting every limitation of claim 7. 35 U.S.C. § 271(a).

At the close of Impulse's case, there is no legally sufficient evidentiary basis for a reasonable jury to find any of those § 271(a) acts by DWS with respect to a claimed drilling string.[11] The record shows only that DWS supplies its friction reduction tools. There is no evidence DWS supplies, assembles, controls, or uses a complete drilling string comprising a plurality of those assemblies, or evidence that DWS sold or offered to sell any such drilling string. *See* PTX-383.0001 (no drilling string shown on DWS field estimate); Trial Tr. 179:10–180:6 (Feb. 26, 2026) (conceding no evidence that DWS supplies, rents, uses, or operates drilling strings).

---

[11] Impulse does not contend that DWS infringes by importation and relies only on "making," "using," "selling," and "offering to sell" products for its direct infringement case. *See, e.g.*, Trial Tr. 120:12–19 (Feb. 23, 2026) (instructing the jury on direct infringement theories).

Federal Circuit law confirms that supplying a component is not enough: direct infringement requires proof the defendant committed a § 271(a) act with respect to an apparatus meeting the claim limitations, and where the defendant does not make, sell, use, offer, or import the claimed assembled whole, infringement fails as a matter of law. *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310–12 (Fed. Cir. 2005); *CloudofChange, LLC v. NCR Corp.*, 123 F.4th 1333, 1340–42 (Fed. Cir. 2024), *cert. denied*, 145 S. Ct. 2684 (2025) (holding judgment as a matter of law of non-infringement proper where the evidence shows the accused "use" is by customers, not the defendant).

Thus, DWS is entitled to judgment as a matter of law of no direct infringement of claim 7 of the '337 Patent.

## C. Impulse presented no evidence that DWS infringes under 35 U.S.C. § 271(b).

DWS moves for judgment as a matter of law on Impulse's induced infringement theory under 35 U.S.C. § 271(b). Judgment as a matter of law is appropriate where the plaintiff fails to present legally sufficient evidence on the elements unique to induced infringement. *See, e.g.*, *Roche Diagnostics v. Meso Scale*, 30 F.4th 1109, 1119 (Fed. Cir. 2022) (holding a jury's verdict of inducement "couldn't have survived JMOL" absent proof satisfying the proper intent standard). For inducement, this includes proof of (1) direct infringement by a third party, (2) knowledge of the asserted patents, (3) knowledge that the induced acts constitute infringement (or willful blindness), and (4) specific intent and affirmative acts to encourage infringement. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011); *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305–06 (Fed. Cir. 2006).

Although Impulse pleaded induced infringement, it did not try that theory to the jury. *See* Dkt. No. 1, ¶¶ 39, 63, 84. Indeed, Impulse presented no fact testimony, expert testimony, or exhibits directed to proving the elements unique to inducement—knowledge that the induced acts

constitute infringement and specific intent/affirmative inducement. Impulse presented no evidence that DWS took affirmative steps with the purpose of causing infringement. It provided no evidence of customer-directed instructions, training, marketing, or other conduct aimed at encouraging customers to engage in infringing conduct. Nor did it present any evidence tying any alleged "inducing" conduct to any proven third-party direct infringement. Accordingly, there is no legally sufficient evidentiary basis for a reasonable jury to find induced infringement.[12]

Inducement also fails as a matter of law for claim 7 of the '337 Patent. As explained above, claim 7 recites "[a] drilling string comprising a plurality of the [friction reduction] assemblies of claim 1." PTX-003.0020. While DWS supplies the accused assembly, there is no evidence that it supplies any drilling strings. *See* Trial Tr. 179:14–180:6 (Feb 26, 2026). And even *if* a third party made or used a drilling string meeting claim 7, Impulse presented no evidence that DWS specifically intended to cause that configuration.

The Court should enter judgment as a matter of law that Impulse cannot recover on any § 271(b) theory.

**D.    Impulse presented no evidence that DWS infringes under 35 U.S.C. § 271(c).**

DWS similarly moves for judgment as a matter of law on Impulse's contributory infringement theory under 35 U.S.C. § 271(c). Contributory infringement requires proof that (1) a third party directly infringed; (2) DWS sold, offered to sell, or imported a component constituting a material part of the patented invention; (3) the component was especially made or especially adapted for use in an infringing manner; (4) the component is not a staple article or commodity of commerce suitable for substantial non-infringing use; and (5) DWS knew the component was

---

[12] Moreover, Impulse repeatedly stated during negotiations over the preliminary jury instructions that there was no induced infringement claim in the case, so the absence of evidence at trial is unsurprising.

especially made or adapted for use in an infringement of the asserted patent. 35 U.S.C. § 271(c); *Global-Tech*, 563 U.S. at 766 (knowledge requirement). Where the patentee fails to present legally sufficient evidence on a required § 271(c) element, judgment as a matter of law is proper. *See, e.g.*, *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1356–57 (Fed. Cir. 2007).

Impulse may have pleaded contributory infringement, but like inducement, Impulse's trial presentation supplied no evidentiary basis to send that theory to the jury. *See* Dkt. No. 1, ¶¶ 40, 64, 85. Impulse introduced no fact testimony, expert testimony, or exhibits directed to the core § 271(c) requirements—particularly that (i)  any accused "component" is a ***non-staple material part*** that is especially made or adapted for infringing use and lacks substantial non-infringing uses, and (ii) DWS had the requisite ***knowledge*** that any alleged component was especially made or adapted for infringement. On this record, no reasonable jury could find contributory infringement. The Court should enter judgment as a matter of law that Impulse cannot recover on any § 271(c) theory.

**E.    Because Impulse failed to mark its patented tools, it is barred from recovering damages before providing actual notice of infringement.**

Under 35 U.S.C. § 287(a), when a patentee makes or sells a patented article without marking it with the patent number, damages can only be recovered for infringement occurring after the infringer was notified of the infringement. *See* 35 U.S.C. § 287(a); *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994). Section 287(a) also makes clear that marking should be ***on the article itself***; only "when, from the character of the article, this ***can not*** be done" may the patentee use a label affixed to the article or its packaging. 35 U.S.C. § 287(a) (emphasis added). Impulse bears the burden to prove compliance with § 287(a). *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1366–67 (Fed. Cir. 2017).

Impulse's PowerPulse and ActiPulse tools practice the '976, '584, and '337 Patents. Trial Tr. 48:22–49:5 (Feb. 24, 2026); Trial Tr. 170:24–171:24 (Feb. 26, 2026). Those tools are manufactured and assembled by Impulse's Canadian entity in Canada and then shipped to Impulse USA. Trial Tr. 93:6–17 (Feb. 24, 2026). When Impulse ships its tools, they are not marked with any patent numbers. Trial Tr. 98:16–18 (Feb. 24, 2026). Instead, Impulse later affixes a label to the tool. Trial Tr. 28:1–8 (Feb. 24, 2026). But Impulse cannot rely on the marking statute's "label" alternative because the evidence establishes that the character of Impulse's tools permits direct marking. Indeed, Impulse engraves ***other*** information directly on the tool, confirming that the tool's character ***does*** permit direct marking. Trial Tr. 100:22–101:1 (Feb. 24, 2026); PTX-742.0001. Wade McCutcheon, Vice President of Impulse USA, admitted that there was ***no reason*** Impulse could not also engrave the patent numbers on the tool itself:

> Q.   There's no reason that Impulse couldn't also engrave the '584 Patent on its tools, is there?
> A.   We could.
> Q.   But you don't?
> A.   We don't.

Trial Tr. 101:2–4 (Feb. 24, 2026). Impulse offered no evidence that engraving (or other direct marking) was impossible—only that it may have been less convenient or less visible under some conditions. Trial Tr. 101:2–14 (Feb. 24, 2026). Because direct marking was feasible, Impulse's failure to mark the articles themselves (or comply with virtual marking) means Impulse did not provide constructive notice under § 287(a). 35 U.S.C. § 287(a).

The Court should enter judgment as a matter of law that Impulse failed to satisfy § 287(a)'s constructive notice requirement and therefore cannot recover any damages for alleged infringement occurring before Impulse provided actual notice of infringement. At a minimum, any damages must be limited to the post-notice period only. *Amsted*, 24 F.3d at 187.

**F.      Impulse is barred from recovering pre-suit damages because there is no evidence that it provided actual notice of infringement.**

As explained above, the trial evidence establishes that Impulse failed to provide constructive notice through proper marking of its patented tools. When constructive notice is absent, § 287(a) permits damages only after the patentee provides actual notice of infringement. 35 U.S.C. § 287(a). Actual notice requires an ***affirmative communication*** of a ***specific charge*** of infringement by a ***specific*** accused product or activity. *Amsted*, 24 F.3d at 187; *see also Lubby Holdings LLC v. Chung*, 11 F.4th 1355, 1360–61 (Fed. Cir. 2021) (reversing pre-suit damages where evidence did not show that plaintiff affirmatively communicated a specific charge of infringement). Merely notifying a party of the existence of a patent or inviting licensing discussions is insufficient. *See Amsted*, 24 F.3d at 187. The communication must "inform the defendant of infringement and of the patentee's intention to enforce its patent." *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997).

The only evidence that Impulse presented at trial of any alleged notice of infringement was three substantively identical letters it sent to DWS's founders sometime in October 2022. *See* Trial Tr. 86:18–88:18, 136:5–15 (Feb. 25, 2026); PTX-70.0001; PTX-71.0001; PTX-72.0001. But those letters cannot constitute actual notice as a matter of law. The letters did not identify any specific DWS product as infringing. Trial Tr. 138:5–10 (Feb. 25, 2026). Nor did they identify any specific patent claim, explain how any DWS product allegedly infringes, or even use the word "infringe." Trial Tr. 137:18–22, 138:11–22 (Feb. 25, 2026); PTX-70.0001; PTX-71.0001; PTX-72.0001. And the letters did not demand cessation of any infringing activity or threaten enforcement litigation. Indeed, Doug Kinsella, Impulse's President and the author of the letters, admitted that the letters "did ***not*** charge DWS with infringing any of Impulse's patents." Trial Tr. 137:23–138:1 (Feb. 25, 2026) (emphasis added). Instead, they were intentionally written to be ***non***-aggressive and

*business*-oriented, not as a formal infringement accusation. *See* Trial Tr. 86:23–87:9, 138:2–4, (Feb. 25, 2026). At most, the letters suggested that Impulse was interested in licensing its patent portfolio, but Federal Circuit precedent is clear that notice of the patents with an invitation to license is not enough. *Amsted*, 24 F.3d at 187.

Furthermore, it is immaterial whether DWS responded with a letter from its lawyer laying out the reasons why DWS doesn't infringe. Trial Tr. 89:24–90:3 (Feb. 25, 2026). As is Mr. Kinsella's conjecture that someone could have "inferred" what products his letters were referring to. Trial Tr. 89:13–20 (Feb. 25, 2026). "It is irrelevant [under § 287] . . . whether the defendant knew of the patent or knew of his own infringement. The correct approach to determining notice under [§] 287 ***must focus on the action of the patentee***, not the knowledge or understanding of the infringer." *Lubby*, 11 F. 4th at 1360 (alteration in original) (emphasis added) (quoting *Amsted*, 24 F.3d at 187). Here, Impulse's own testimony confirms it intentionally ***avoided*** making a specific charge of infringement.

Because the October 2022 letters do not constitute legally sufficient actual notice under § 287(a), and there is no other evidence of actual notice in the record, Impulse cannot recover any pre-suit damages. Accordingly, the Court should grant judgment barring recovery of any damages prior to the filing of this action.

**G.    Impulse failed to apportion its damages to the value attributable to the alleged inventions.**

DWS moves for judgment as a matter of law that Impulse cannot recover the reasonable-royalty damages it seeks because it has failed to present legally sufficient evidence apportioning damages to the incremental value attributable to the claimed inventions, as required by Federal Circuit law.

A patentee must "in every case give evidence tending to separate or apportion . . . the patentee's damages between the patented feature and the unpatented features." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). The "essential requirement" is that any reasonable royalty must be based on "the incremental value that the patented invention adds to the end product." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018). This requirement applies even where the asserted claims cover an entire product, because the royalty must still apportion between the alleged improvement and conventional features. *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377–80 (Fed. Cir. 2021). Where the patentee fails to provide a legally sufficient apportionment basis, damages cannot stand and may be limited to nominal damages. *Rex Med., L.P. v. Intuitive Surgical, Inc.*, 156 F.4th 1289, 1301 (Fed. Cir. 2025) (affirming judgment as a matter of law reducing damages to $1).

As discussed below, Impulse's reasonable-royalty presentation fails to apportion in two independent ways: (1) it fails to apportion value among distinct patents and (2) it fails to apportion value away from conventional components.

### 1. Impulse's "patent-family" damages theory is not patent- or invention-specific apportionment.

Impulse's damages expert, Mr. Jeffrey Andrien, did not apportion value among the distinct asserted patents and inventions. Instead, he treated the '976 and '584 Patents as interchangeable and proposed the same damages number regardless of whether **one** patent or **both** patents are infringed. Trial Tr. 123:5–23, 124:4–17 (Feb. 27, 2026) (testifying that regardless of "whether you infringed ***just the '584 or both***," damages "would be the $45 million" (emphasis added)); Trial Tr. 161:24–163:9 (Feb. 27, 2026) (admitting that his royalty rate did not distinguish between the two patents, or between the claims within an individual patent). That type of "patent-independent" approach is legally insufficient absent evidence that a comparable license or negotiation supports

identical value for a one-patent versus two-patent license. *Omega*, 13 F.4th at 1379 (rejecting "patent/claim-independent approach" as failing to account for apportionment). Likewise, where an expert relies on license evidence, Federal Circuit law requires the analysis to tie the royalty to the value of what is actually licensed—not to a generalized number divorced from the specific asserted patent value. *See Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 974 (Fed. Cir. 2022).

Because Impulse seeks a single lump-sum figure for distinct patents without reliably separating their value, no reasonable jury could award the requested royalty consistent with § 284 apportionment principles.

### 2. Impulse presented no reliable apportionment for undisputedly conventional components of the accused tools.

Even if the smallest saleable patent-practicing unit is the accused friction reduction tool, apportionment does not stop there. Impulse must still prove the incremental value of the alleged improvements as distinguished from conventional aspects of the tool. *Exmark*, 879 F.3d at 1348; *Omega*, 13 F.4th at 1377–78; Trial Tr. 155:10–19 (Feb. 27, 2026) (agreeing that plaintiff must "apportion[] away from any value of any conventional features" and "isolate the value of the technology"). But Mr. Andrien, Impulse's damage expert, admitted that he did not know what "conventional" means or what the "conventional piece[s]" of the accused tools were. Trial Tr. 160:13–161:5 (Feb. 27, 2026).

The record shows that the first friction reduction tool pre-dated the patent, and that the accused tools include multiple indisputably conventional components and features, such as a positive displacement motor, shock tools, inverter subs, and ball drop. *See* Trial Tr. 154:23–156:16 (Feb. 25, 2026) (admitting Impulse did not invent any of these components and features, nor did it invent the first friction reduction tool). But, lacking an understanding of "which parts were conventional pieces and which parts were not," Mr. Andrien improperly attributed the value of the

tool *as a whole* to the asserted patents without separating the value of the alleged inventions from the value of those conventional components. *See* Trial Tr. 160:4–161:5 (Feb. 27, 2026) (admitting he did not apportion out the mud motor, for example, and operated under the assumption that "the patented technology encompasses all those conventional components"); Trial Tr. 157:16–158:4, 158:18–159:4, 159:16–161:5 (Feb. 27, 2026) (including revenues from 100% of the PowerGLIDE tool even though parts of the product existed before); *see also* Trial Tr. 158:11–17 (Feb. 27, 2026) (including unpatented *services*, like job setup fees). The result is an analysis that sweeps in value attributable to conventional features and other non-patented factors rather than the incremental value of the alleged inventions. That is exactly what *Exmark* and *Omega* prohibit. *Exmark*, 879 F.3d at 1348; *Omega*, 13 F.4th at 1377–78.

Where a patentee fails to provide a legally sufficient apportionment basis, a damages award cannot stand. *Rex Med.*, 156 F.4th at 1301. Because Impulse has not presented legally sufficient evidence to apportion its damages to the incremental value of the alleged inventions (either among distinct patents or away from conventional components), Impulse is not entitled to damages even if the jury finds infringement and validity. *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020) ("[Section 284] does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts."). The Court should enter judgment as a matter of law that Impulse may not recover the reasonable-royalty damages requested by Mr. Andrien and limit recovery, at most, to nominal damages. *Rex Med.*, 156 F.4th at 1301.

## H.    Impulse's other damages evidence fails as a matter of law.

A reasonable-royalty award must be grounded in evidence admitted at trial; where a damages theory depends on technical predicates that were never established in the record, it provides no legally sufficient basis for a jury verdict. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (holding damages theories must be tied to the facts of the

case). While a damages expert may rely on technical evidence in valuing the accused products and the asserted technology, the underlying technical predicates must be established through admissible evidence—not assumed or supplied by the damages expert's say-so. That is particularly true where the damages opinions turn on technical issues like (1) whether a prior agreement involves technically comparable technology sufficient to serve as a benchmark for the hypothetical negotiation and (2) whether alleged "convoyed" items are functionally and technically linked to the accused products.

Here, Impulse presented no trial evidence from its technical expert establishing those predicates, so Mr. Andrien's opinions on each issue rest on unsupported assumptions and cannot sustain a damages award as a matter of law.

### 1. Impulse failed to show that the NOV/TLL agreement is technically comparable for purposes of the hypothetical negotiation.

DWS is entitled to judgment as a matter of law that Impulse failed to demonstrate the NOV/TLL agreement is technically comparable to the technology at issue in this lawsuit.

Federal Circuit law requires a damages expert to "*carefully* tie proof of damages to the claimed invention's footprint in the market place," including by establishing that any relied-upon licenses are technologically and economically comparable. *LaserDynamics*, 694 F.3d at 80 (emphasis added) (holding that license evidence has "*no place*" in the case where "comparability between it and a hypothetical license to the [asserted patent] [is] absent" (emphasis added)). And the Federal Circuit has made clear that conclusory assertions of "comparability" are insufficient; the proponent must "adequately establish" technological comparability before a license can be used as a benchmark. *ADASA, Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 915 (Fed. Cir. 2022). Thus, Mr. Andrien cannot anchor his reasonable-royalty rate to the NOV/TLL agreement without competent evidence establishing the agreement's licensed technology is technically comparable to

the asserted technology here. Trial Tr. 152:17–20 (Feb. 27, 2026) (agreeing technical comparability is required).

No such foundation exists. As preliminary issue, the NOV/TLL agreement, which is ***not even a license***, has no common patents or common parties. *See* Trial Tr. 173:15–21, 174:10–21 (Feb. 27, 2026) (not disputing the agreement has no express license). Nor did Impulse supply any admissible technical-comparability showing that could salvage use of the NOV/TLL agreement as a rate-setting benchmark. Mr. Andrien did not analyze technical comparability and relied only on Impulse's technical expert, Dr. Kytömaa. Trial Tr. 198:21–199:2 (Feb. 27, 2026). But Dr. Kytömaa never compared the technology contemplated in the NOV/TLL agreement to the technology of the asserted patents. He offered no testimony at trial describing what technology the NOV/TLL agreement covered and explaining why it would be technically comparable to the asserted inventions. *See generally* Trial Tr. 68:12–173:23 (Feb. 26, 2026). Without that technical foundation in evidence, Mr. Andrien has no competent basis to treat the agreement as a comparable license that can set a royalty rate. *See LaserDynamics*, 694 F.3d at 80; *ADASA*, 55 F.4th at 915.

The remaining record reinforces the absence of comparability. Troy Lorenson, named inventor on the asserted patents, independently confirmed that the NOV lawsuit and the '065 Canadian patent from that case concerned technology materially different from, and in fact absent from, his own Jigger tool. He testified that after NOV sued him, he sold Jigger tools to Amega West, and Amega West then prevailed on non-infringement in a separate infringement action brought by NOV. Trial Tr. 191:21–192:6, 192:14–193:16 (Feb. 24, 2026). In other words, a federal court determined that the technology embodied in the Jigger tool did not infringe the NOV patent. That outcome underscores that the NOV patent covered features ***not*** present in the Jigger tool and,

by extension, provides no technical foundation to treat the NOV/TLL agreement as a benchmark for valuing the distinct technology Impulse now asserts.

Mr. Lorenson also confirmed the NOV technology is obsolete. He testified that the NOV single-port, 1:2 agitator design's patent has expired, and he does not know of "anybody building them." Trial Tr. 193:17–24 (Feb. 24, 2026). An expired, obsolete design that the market no longer uses cannot serve as a reliable benchmark for valuing the distinct technology allegedly embodied in the asserted patents; comparable-license analysis must account for differences in technologies and economic circumstances. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010) (holding that "differences between the Finjan–Microsoft licensing scenario and a hypothetical negotiation . . . permitted the jury to properly discount the Microsoft license").

Because Impulse failed to introduce legally sufficient evidence of technical comparability, the NOV/TLL agreement cannot support a reasonable-royalty rate as a matter of law.

> **2.**     **Impulse failed to prove the technical and functional link required to support damages for any convoyed sales.**

DWS is entitled to judgment as a matter of law that Impulse failed to prove convoyed sales. Mr. Andrien included alleged "convoyed" revenues for separate products/services sold or rented alongside the accused tools. *See, e.g.*, Trial Tr. 158:5–159:24 (Feb. 27, 2026) (including revenues for job setup fees, shock tools (including SlideKICK), and safety joints). But he did so without evidence that those other sales are functionally tied to the accused products in the way required by Federal Circuit law.

A "convoyed sale" exists only where the non-patented item is functionally associated with the patented item—i.e., where the two together "constitute[] a functional unit." *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d

1538, 1550 (Fed. Cir. 1995) (*en banc*). That showing requires evidence of a technical and functional linkage, not a damages expert's assumption.

Impulse presented no such evidence. Its technical expert, Dr. Kytömaa, did not testify that the accused friction reduction tools and any purportedly convoyed products are components of a single assembly, machine, or functional unit, or otherwise provide any technical analysis establishing the necessary functional association. At most, Dr. Kytömaa acknowledged that DWS sometimes rented a PowerGLIDE with a shock sub or inverter. Trial Tr. 157:1–9 (Feb. 26, 2026). But he did not offer any technical analysis beyond conclusory testimony that those separate items together constitute a functional unit within the meaning of *Rite-Hite*. And the record further undercuts any claim of routine bundling. For example, Blake Goodrum testified that DWS's SlideKICK can be run as a standalone product, and DWS does not often provide that product with its PowerGLIDE tools. *See* Trial Tr. 117:2–18 (Feb. 27, 2026).

With no technical testimony establishing the required functional unit, Mr. Andrien's convoyed-sales theory rests on an unsupported premise and cannot be supplied by assumption. No reasonable jury could find convoyed sales on this record. The Court should grant judgment as a matter of law barring any damages based on alleged convoyed sales.

## CONCLUSION

The Court should grant judgment as a matter of law in DWS's favor.

Dated: March 3, 2026

Respectfully submitted,

*/s/ Nadia E. Haghighatian*

Michael D. Karson
Attorney-in-Charge
    Texas State Bar No. 24090198
    SDTX Fed. No. 3293023
Phillip B. Philbin
    Texas State Bar No. 15909020
    SDTX Fed. No. 11636
Jamie H. McDole
    Texas State Bar No. 24082049
    SDTX Fed. No. 1626626
David W. Higer
    Texas State Bar No. 24127850
    SDTX Fed. No. 3757251
Miranda Y. Jones
    Texas State Bar No. 24065519
    SDTX Fed. No. 1147635
Matthew L. Vitale
    Texas State Bar No. 24137699
    SDTX Fed. No. 3864676
Cody M. Carter
    Texas State Bar No. 24131091
    SDTX Fed. No. 3903320
Eugene M. Massad, III
    Texas State Bar No. 24126247
    SDTX Fed. No. 3943590
WINSTEAD PC
2728 N. Harwood Street
Suite 500
Dallas, Texas 75201
Telephone: (214) 745-5400
Fax: (214) 745-5390
Email: mkarson@winstead.com
        pphilbin@winstead.com
        jmcdole@winstead.com
        dhiger@winstead.com
        mjones@winstead.com
        mvitale@winstead.com
        ccarter@winstead.com
        emassad@winstead.com

Austin C. Teng
   Texas State Bar No. 24093247
   SDTX Fed. No. 3747245
Nadia E. Haghighatian
   Texas State Bar No. 24087652
   SDTX Fed. No. 2598876
Omar A. Marawi
   Texas State Bar No. 24120991
   SDTX Fed. No. 3736903
WINSTEAD PC
600 W. 5th Street, Suite 900
Austin, TX  78701
Telephone: (512) 370-2800
Fax: (512) 370-2850
Email: ateng@winstead.com
      nhaghighatian@winstead.com
      omarawi@winstead.com

Kyle Watson
   Texas State Bar No. 24047078
   SDTX Fed. No. 572417
WINSTEAD PC
24 Waterway Avenue
Suite 500
The Woodlands, Texas 77380
Telephone: (281) 681-5900
Fax: (281) 681-5901
Email: krwatson@winstead.com

*Attorneys for Defendant*
*Downhole Well Solutions, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 3, 2026, I electronically submitted the foregoing document with the clerk of the United States District Court for the Southern District of Texas, using the electronic case management CM/ECF system of the Court which will send notification of such filing to all counsel of record who are deemed to have consented to electronic service.

*/s/ Nadia E. Haghighatian*
Nadia E. Haghighatian
